UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

ADAM KRZEMINSKI,

        Plaintiff,

vs.

CITY OF STERLING HEIGHTS,

        Defendant.

Case No.
Hon.
Mag. Judge

---

## COMPLAINT AND JURY DEMAND

Plaintiff Adam Krzeminski, for his Complaint and Jury Demand against Defendant City of Sterling Heights submits as follows:

### JURISDICTIONAL ALLEGATIONS

1.    This is an action for violations of 42 USC § 1981 ("§ 1981"), the Elliott Larsen Civil Rights Act, MCL 37.2201 *et seq.* ("ELCRA"), and the Michigan Whistleblowers Protection Act, MCL 15.361 *et seq.* ("MWPA"), all arising out Defendant's discriminatory and retaliatory termination of Plaintiff's employment and refusal to hire Plaintiff at the end of Plaintiff's probationary period because of Plaintiff's ethnicity, nationality, opposition to discriminatory practices on the basis of ethnicity, nationality, and sex, and/or participation in the investigation of another employee's discrimination claims against Defendant.

2. Plaintiff Adam Krzeminski is an individual of Polish ethnicity and national origin, his wife is an individual of Middle Eastern ethnicity, and he has multiple close family members who are LGBTQ.

3. Plaintiff resides in Rochester Hills, Michigan in Oakland County within the Eastern District of Michigan.

4. Defendant City of Sterling Heights is a municipal corporation and governmental subdivision organized and existing under the laws of the State of Michigan located in Macomb County within the Eastern District of Michigan.

5. Plaintiff was an employee of Defendant from May 5, 2025 until October 28, 2025 when Defendant fired him from his probationary position as a Facilities Maintenance Mechanic and refused to hire him for an open full-time Facilities Maintenance Mechanic position for which he had applied and was qualified.

6. This Court has federal question jurisdiction over Plaintiff's federal claims under 28 USC § 1331.

7. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 USC § 1367 as all such claims are related to, and form part of the same case or controversy as, Plaintiff's federal claims.

8. Venue is proper in this district under 28 USC § 1391(a)(2), (b)(1), and (b)(2) because a substantial part of the events giving rise to this claim occurred in this judicial district and defendant resides in this judicial district.

## GENERAL ALLEGATIONS

9. On or around May 5, 2025, Defendant hired Plaintiff as a Facilities Maintenance Mechanic and placed him on a 180-day probationary period.

10. Throughout the course of his employment with Defendant, Plaintiff performed all tasks assigned to him by Defendant ably and well.

11. Prior to his abrupt and unexpected termination and non-hire on October 28, 2025, Plaintiff was never formally disciplined or reprimanded while working for Defendant and had received no material negative feedback on his work performance or conduct.

12. In late May /early June 2025, Plaintiff's Polish co-worker Greg Dziekonski ("Dzeikonski") went on leave and initiated claims against Defendant alleging hostile work environment and ethnicity and national origin discrimination because Dziekonski was subjected to constant and pervasive harassment and disparaging comments by Plaintiff's and Dziekonski's two direct managers Todd Macovis ("Macovis") and Don Barron ("Barron"), as well as by other co-workers in the Facilities Maintenance Department.

13. While at work, Macovis and Barron made constant, pervasive, and hateful comments about Arabs, Poles, and women, including but not limited to direct comments to Dziekonski disparaging Poles, sexualized comments about Dziekonski's spouse, and sexualized comments about women in Defendant's Human Resources Department.

14. Plaintiff witnessed some of his managers' disparaging and inappropriate comments, including comments about Dziekonski and his Polish ethnicity and national origin, and directly opposed such conduct including by telling his managers and co-workers to "knock it off" and that "it's not funny," but Plaintiff was ignored.

15. Macovis informed Plaintiff that Defendant was conducting an investigation regarding Dziekonski's claims and Macovis told Plaintiff not to discuss the investigation or the underlying conduct.

16. In or around early July 2025, Plaintiff directly participated in Defendant's investigation of Dziekonski's claims by submitting to an interview and giving a statement to Defendant's outside counsel conducting the investigation of Dziekonski's claims of hostile work environment as well as ethnic, national origin, and sex discrimination and harassment.

17. Plaintiff answered Defendant's investigator's questions accurately and honestly.

18. On information and belief, Defendant's investigator issued a report substantiating Dziekonski's claims.

19. After Plaintiff's participation in the investigation, Macovis told Plaintiff and the other Facilities Maintenance Department employees that Defendant's investigation had determined there was "some" wrongdoing and

4

that various Facilities Maintenance Department team members (but not Plaintiff) would be required to take short periods of unpaid leave as punishment.

20. Macovis explicitly told Plaintiff and the other team members that the investigation and the consequences were happening because Dziekonski is Polish and "is a dumb Pollock and that's why he talked with HR about the way he was treated."

21. Plaintiff, who is also of Polish ethnicity and national origin and who Macovis knew to be of Polish ethnicity and national origin, asked what Macovis meant by these statements, to which Macovis responded to Plaintiff and in front of the other team members, "not you, them, they all stick together like a community you know what I mean" and that "they," referring to Poles including Plaintiff, "complain" and are dumb.

22. After Macovis made these statements to Plaintiff, Macovis and Barron shunned, ignored, barely talked to, and barely acknowledged Plaintiff as Macovis and Barron knew Plaintiff opposed discrimination and the disrespectful and discriminatory conduct he had witnessed and experienced while working for Defendant (including by telling them to knock it off and that it was not funny) and further knew Plaintiff had participated in Defendant's investigation of Dziekonski's claims.

23. Notwithstanding Macovis's and Barrons's differential and negative treatment of Plaintiff following the conclusion of the internal investigation of

5

Dziekonski's claims, Plaintiff, who wanted his job and enjoyed working for Defendant but for the inappropriate conduct of his managers and some of his co-workers, continued to perform all of his job duties well.

24. In late July, Barron took a picture of an individual who appeared biologically male but was dressed as a female at Defendant's annual "Sterlingfest" where Plaintiff and others from the Facilities Maintenance Department were working, and then, two days later, showed Plaintiff and other co-workers from the Facilities Maintenance Department the picture while commenting "look at this freak with his kid dressed like a freak – he is disgusting."

25. Plaintiff, who has several close family members that identify as LGBTQ, including a daughter, and whose relationship with these LGBTQ individuals was known by Macovis and Barron, verbally opposed Barron's comments and attempted to get Barron to empathize, asking Barron when Barron showed Plaintiff the pictures and made the hateful comments, "What would you do if your sons told you they were gay or trans, would you accept them?" to which Barron responded that his kids would not do that [i.e., be LGBTQ] because "he raised them right."

26. On or around September 15 or 16, 2025, with about 6 weeks remaining in Plaintiff's probationary period, Plaintiff reached out to Defendant's Lead Human Resources Coordinator Sarah Scowden ("Scowden")

about continuing to work for Defendant after the end of Plaintiff's probationary period, to which Scowden responded by email on September 16, 2025:

> Good morning Adam,
>
> Thank you for reaching out! While the contract indicates that the probationary period must be met in order to apply for an internal promotion, I would still recommend submitting an application if you are interested in a full-time position. While you can't be considered as an internal candidate during your probationary period, we have previously considered probationary employees as external candidates, alongside the rest of the external candidate pool.
>
> Beyond that, you'll be meeting your probationary period in a few weeks, which is all the more reason to apply.
>
> I hope that helps, but please let me know if you have any additional questions!

27. Following this encouraging response from Defendant's Lead Human Resources Coordinator Scowden, Plaintiff applied for an open full-time Facilities Maintenance Mechanic role.

28. On October 14, 2025, Defendant's Human Resources Coordinator Kaitlyn Timm ("Timm") emailed Plaintiff to thank him for his interest in the Facilities Maintenance Mechanic position and wrote "We have reviewed your information and would like to schedule you for a brief 15-20 minute phone screening to discuss the position and your background in more detail."

29. After some back and forth emailing on scheduling the phone screening time, Plaintiff and Timm had their call on October 21, 2025.

30. During the call on October 21, 2025, Plaintiff answered all questions honestly and spoke positively about his working for Defendant.

31. Toward the end of the October 21, 2025 phone screening, Timm asked Plaintiff how he liked his job so far, to which Plaintiff responded "I love it and that's why I'm trying to go full time" even though there had "been some drama" and that "it was a great job except when the department was being investigated with Dziekonski."

32. One week later, on October 28, 2025, Macovis called Plaintiff into a meeting with Macovis and Scowden.

33. At the October 28, 2025 meeting, Scowden introduced herself and stated "nice to meet you finally I now get to put a face with the name" and Plaintiff responded that it was nice to meet her too.

34. Macovis then said "let's cut to the chase make this quick and simple we are letting you go today and we will pay you through the rest of the day. You can collect unemployment but we need you to turn in your uniform, badge and keys and we will then send you home."

35. Plaintiff was in complete shock from Macovis's statement and responded to Macovis "what happened?"

36. Macovis responded to Plaintiff claiming that other managers had said Plaintiff was not completing jobs but Plaintiff knew that this was not true as he had in fact completed all jobs assigned to him - except those where parts

8

had not arrived, as documented in the work system, with such jobs to be completed later - and had been receiving compliments on his performance from other department managers.

37. Plaintiff still perplexed by Macovis's explanation further responded "this is hitting me really hard I don't understand."

38. Macovis then said to Plaintiff "that it was off-putting that during the [HR] phone interview it was your time to shine and you instead did more complaining about the department."

39. Macovis's statement was a direct reference to Plaintiff's participation in the Dziekonski investigation and incidental mentioning of the investigation in his phone screening interview with Timm as a reason for Plaintiff's abrupt termination and non-hire for the open full-time Facilities Maintenance Mechanic position.

40. Plaintiff was shocked by Macovis's explicit and direct statement indicating he was being fired in retaliation for participating in the Dziekonski investigation while Defendant's Lead Human Resources Coordinator sat by saying nothing.

41. On information and belief, Macovis's and Barron's animus toward Plaintiff because of his ethnicity, national origin, and opposition to sex and sexual orientation discrimination, as evidenced by their comments to Plaintiff

9

during the course of his employment, further contributed to and caused Plaintiff's wrongful termination and non-hire.

42. For Plaintiff, upon learning he was being fired, the room was spinning and his stomach dropped and he felt sick at the way he was being treated.

43. Plaintiff then stood up, handed his badge and keys to Macovis, and found himself unable to speak further.

44. Macovis then told Plaintiff to gather his personal belongings and be on his way out and to return his uniforms soon.

45. Defendant's discriminatory and retaliatory termination of Plaintiff's employment through Macovis because of who he was (a person of Polish ethnicity and national origin), because of his speaking up against the discriminatory misconduct he witnessed and experienced from Macovis and Barron, and because of Plaintiff's participation in Defendant's investigation of Dziekonski's claims caused Plaintiff harm including loss of income, loss of benefits, damage to his reputation as a good worker, sleeplessness, stress, harm to self-esteem, and emotional distress.

## COUNT I

### ETHNICITY DISCRIMINATION AND RETALIATION IN VIOLATION OF 42 USC § 1981

46. Plaintiff incorporates the preceding paragraphs by reference.

47. Plaintiff is of Polish ethnicity.

48. As a person of Polish ethnicity, Plaintiff belongs to an identifiable class of persons who have been subject to discrimination on the basis of their ethnicity.

49. Defendant, through manager Macovis, intended to discriminate against Plaintiff on account of his being of a class of persons of Polish ethnicity who Macovis directly stated "stick together," "complain," and are "dumb," perpetuating vile stereotypes against Poles as a class and against Plaintiff as an individual member of such class.

50. Plaintiff's ethnicity played a role and was a motivating factor in Defendant's decision to fire him and not hire him for a full-time position.

51. Defendant's discriminatory conduct abridged Plaintiff's equal rights to make and enforce contracts including contracts of employment.

52. Defendant's violation of Plaintiff's rights under § 1981 as set forth above was reckless, willful, intentional, and/or deliberate.

53. As a direct and proximate result of Defendant's conduct, Defendant harmed Plaintiff, Plaintiff suffered injuries, and Plaintiff is entitled to:

    A. compensation for loss of wages and employment benefits;

    B. compensation for emotional distress;

    C. compensation for all such other economic damages as allowed by law;

D.    interest;

E.    punitive damages;

F.    equitable relief including but not limited to reinstatement; and

G.    reasonable attorney fees, reasonable expert witness fees, and other costs of this action.

## COUNT II

### ETHNICITY, NATIONAL ORIGIN, SEX, AND SEXUAL ORIENTATION DISCRIMINATION AND RETALIATION IN VIOLATION OF ELCRA, MCL § 37.2201 *et seq.*

54. Plaintiff incorporates the preceding paragraphs by reference.

55. Plaintiff was Defendant's employee.

56. Plaintiff is of Polish ethnicity, is of Polish national origin, was known by Defendant as a family member and supporter of LGTBQ individuals, was known by Defendant to have opposed discrimination on the basis of ethnicity, national origin, sex, and sexual orientation, and was known by Defendant as a participant in the investigation of another employee's ethnicity, national origin, and sex discrimination claims against Defendant.

57. Plaintiff was qualified for his job with Defendant and qualified for a full-time position.

58. Plaintiff was subject to an adverse employment decision in that he was fired from his probationary position as a Facilities Maintenance Mechanic and not hired for a full-time position as a Facilities Maintenance Mechanic on

account of his being of Polish ethnicity, his being of Polish national origin, his being a family member and supporter of LGTBQ individuals, his opposition to discrimination, and/or his participation in the investigation of another employee's ethnicity, national origin, and sex discrimination claims against Defendant.

59. There is both an explicitly stated by Plaintiff's manager as well as a temporal nexus between Plaintiff's protected characteristics and actions listed above and the adverse employment decisions described above in that Plaintiff's termination was because of Plaintiff's protected characteristics, opposition to discrimination on the basis of ethnicity, national origin, and status as a family member of LGBTQ individuals, and/or as well as in retaliation for Plaintiff's participation in the investigation of a co-workers ethnicity/national origin discrimination and harassment claims.

60. Plaintiff was treated differently than co-workers in that he was fired and not hired for a full-time position whereas others who were not Poles, did not have LGBTQ relatives or speak out about discriminatory conduct toward such individuals, and/or who did not supportively participate in investigation of a co-workers discrimination claims, were not.

61. Defendant retaliated against Plaintiff by firing him and refusing to hire him for a full-time position after he directly opposed discrimination and

13

supportively participated in the investigation of his co-worker's discrimination/harassment claims.

62. Defendant's violations of Plaintiff's ELCRA rights as set forth above were reckless, willful, intentional, and/or deliberate.

63. As a direct and proximate result of Defendant's conduct, Defendant harmed Plaintiff, Plaintiff suffered injuries, and Plaintiff is entitled to:

    A. compensation for loss of wages and employment benefits;

    B. compensation for emotional distress;

    C. compensation for all such other economic damages as allowed by law;

    D. interest;

    E. punitive damages;

    F. equitable relief including but not limited to reinstatement; and

    G. reasonable attorney fees, reasonable expert witness fees, and other costs of this action.

## COUNT III

**RETALIATION IN VIOLATION OF MWPA, MCL § 37.1101 *et seq.***

64. Plaintiff incorporates the preceding paragraphs by reference.

65. Plaintiff performed services for wages under a contract for hire with Defendant.

66. Plaintiff is an "employee" as defined under the MWPA.

67. Defendant is a city that has one or more employees.

68. Defendant is an "employer" as defined under the MWPA.

69. Defendant is also a "public body" as defined under the MWPA.

70. Defendant requested Plaintiff participate in an investigation held by Defendant as a public body.

71. Plaintiff participated in an investigation held by Defendant as a public body.

72. Plaintiff engaged in protected activity by participating in Defendant's investigation of Dziekonski's claims.

73. Plaintiff was discharged by Defendant.

74. There is a direct and explicit causal connection between Plaintiff's participation in Defendant's investigation of Dziekonski's claims and Defendant's discharge of Plaintiff.

75. Defendant knew Plaintiff was engaged in protected activity under the MWPA before Defendant discharged Plaintiff.

76. As a direct and proximate result of Defendant's violation of the MWPA, Defendant harmed Plaintiff, Plaintiff suffered injuries, and Plaintiff is entitled to:

      A.    compensation for loss of wages and employment benefits;

      B.    compensation for emotional distress;

      C.    compensation for all such other economic damages as allowed by law;

D.    interest;

E.    equitable relief including but not limited to reinstatement; and

F.    reasonable attorney fees, reasonable expert witness fees, and other costs of this action.

## JURY DEMAND

Plaintiff Adam Krzeminski, by his attorneys Sterling Attorneys at Law, P.C., demands a trial by jury of all claims so triable.

Dated: January 23, 2025    Respectfully submitted,

STERLING ATTORNEYS AT LAW, P.C.

By:    /s/ Edmund S. Aronowitz
Edmund S. Aronowitz (P81474)
33 Bloomfield Hills Pkwy., Ste. 250
Bloomfield Hills, MI 48304
(248) 644-1500

*Attorney for Plaintiff Adam Krzeminski*